# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TONIA K. COUILLARD,

                **Plaintiff,**

    **v.**                               **Case No. 18-CV-486**

NANCY A. BERRYHILL,

                **Defendant.**

# DECISION AND ORDER

## PROCEDURAL HISTORY

Plaintiff Tonia Couillard alleges she has been disabled since January 21, 2011, due to "mental health impairments including among others, a conversion disorder, bipolar disorder and anxiety, degenerative disc disease, interstitial cystitis, headaches, and other severe impairments." (ECF No. 14 at 1.) In April 2011 she applied for disability insurance benefits (Tr. 328-34) and supplemental security income (Tr. 320-25). After her applications were denied initially (Tr. 124-25) and upon reconsideration (Tr. 126-27), a hearing was held before an administrative law judge (ALJ) on February 25, 2013 (Tr. 66-123). On April 8, 2013, the ALJ issued a written decision concluding that Couillard was not disabled. (Tr. 131-42.) On May 30, 2014, the Appeals Council vacated the ALJ's decision. (Tr. 149-50.)

On remand, the Appeals Council instructed the ALJ to: (1) reevaluate and explain the weight given to the nontreating source opinion of Kalpana Rao, Ph.D.; (2) reevaluate Couillard's maximum residual functional capacity (RFC); and (3) obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Couillard's occupational base. (*Id.*)

A second hearing was held before an ALJ on February 18, 2015 (Tr. 11-53), and on March 13, 2015, the ALJ issued a written decision, again concluding that Couillard was not disabled (Tr. 155-68). The Appeals Council denied Couillard's request for review on May 18, 2016. (Tr. 1-4.) Couillard filed suit in this court in June 2016. (Tr. 1641.) On December 14, 2016, the Honorable Pamela Pepper signed an order approving the parties' joint stipulation to remand for further administrative proceedings. (Tr. 1644.) On remand, the Appeals Council instructed the ALJ to: (1) further evaluate the allegations and discussion in the medical record of the potential impairments of conversion disorder and fibromyalgia; (2) further evaluate Couillard's alleged symptoms and provide a rationale in accordance with the disability regulations pertaining to evaluation of symptoms; (3) give further reconsideration to Couillard's maximum RFC during the entire period at issue; and (4) if warranted by the expanded record, obtain supplemental evidence from a vocational expert. (Tr. 1687-88.) Because Couillard filed subsequent, duplicative claims for disability insurance benefits and supplemental security income on June 22, 2016, the

Appeals Council also instructed the ALJ to consolidate the claim filed, create a single electronic record, and issue a new decision on the consolidated claims. (Tr. 1688.)

A third hearing was held before a new ALJ on October 4, 2017. (Tr. 1532-97.) On January 8, 2018, the ALJ issued a written decision concluding that Couillard was not disabled (Tr. 1457-76), which became the final decision of the Commissioner. *See* 20 C.F.R. § 404.984 ("[W]hen a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case."). This action followed. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 4,7), and the matter is now ready for resolution.

## ALJ'S DECISION

In determining whether a person is disabled, an ALJ applies a five-step sequential evaluation process. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. The ALJ found that Couillard "has not engaged in substantial gainful activity since January 21, 2011, the alleged onset date[.]" (Tr. 1460.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). "In order for an impairment to be considered severe at this step of the process, the impairment must significantly limit an

individual's ability to perform basic work activities." *Moore v. Colvin*, 743 F.3d 118, 1121 (7th Cir. 2014). The ALJ concluded that Couillard has the following severe impairments: "bipolar disorder II; mood disorder; panic disorder; personality disorder; conversion disorder with possible pseudoseizures; post-traumatic stress disorder (PTSD); degenerative disc disease of the lumbar spine; interstitial cystitis; and headaches[.]" (Tr. 1460.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.1526, 416.920(d) and 416.926) (called "The Listings.") If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month duration requirement, 20 C.F.R. § 416.909, the claimant is disabled. If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Couillard "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (Tr. 1461.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the claimant's ability to perform both physical and mental work-related activities on a regular and continuing basis despite her impairments. *Moore*, 743 F.3d at 1121. In making the RFC finding, the ALJ must consider all of the

claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p. In other words, the RFC determination is a "function by function" assessment of the claimant's maximum work capability. *Elder v. Astrue*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that Couillard has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she has additional limitations. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. [Couillard] cannot work at unprotected heights or around moving mechanical parts. She cannot operate a motor vehicle in the workplace. She cannot have exposure to concentrated amounts of dust, odors, fumes, and/or pulmonary irritants. With regard to understanding, remembering and carrying out instructions, [Couillard] can perform simple, routine, and repetitive tasks, and not at a production rate pace (e.g., assembly line work). With regard to the use of judgment in the workplace, she can make simple work-related decisions. [Couillard] can frequently interact with supervisors, occasionally interact with coworkers, and never interact with the public. She can tolerate occasional changes in a routine work setting. In addition to normal breaks, [Couillard] will be off task less than 10 percent of the time in an 8-hour workday.

(Tr. 1464.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1526, 416.965. Couillard's past relevant work was as a nursing assistant. (Tr. 1474.) The ALJ concluded that she is unable to perform any past relevant work. (*Id.*)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. At this step the ALJ concluded that, considering Couillard's age,

education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Couillard can perform. (Tr. 1475.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert, who testified that a hypothetical individual of Couillard's age, education, work experience, and RFC could perform the requirements of a laundry worker, mail clerk, and cleaner. (*Id.*) After finding that Couillard could perform work in the national economy, the ALJ concluded that she is not disabled. (Tr. 1475-76.)

## STANDARD OF REVIEW

The court's role in reviewing an ALJ's decision is limited. It does not look at the evidence anew and make an independent determination as to whether the claimant is disabled. Rather, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Moore*, 743 F.3d at 1120. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1120-21 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, it is possible that opposing conclusions both can be supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

It is not the court's role to reweigh evidence or substitute its judgment for that of the ALJ. *Moore*, 743 F.3d at 1121. Rather, the court must determine whether the ALJ complied with his obligation to build an "accurate and logical bridge" between the evidence and his conclusion that is sufficient to enable a court to review the

administrative findings. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas*, 745 F.3d at 806. If the ALJ committed a material error of law the court cannot affirm the ALJ's decision regardless of whether it is supported by substantial evidence. *Beardsley*, 758 F.3d at 837; *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

## ANALYSIS

Couillard contends that (1) the ALJ erred at step three of the sequential evaluation process; (2) the ALJ's RFC determination was not supported by substantial evidence; (3) the ALJ improperly evaluated her testimony; (4) the ALJ improperly weighed the medical opinion evidence; and (5) the ALJ erred in his step-five findings. (ECF No. 14.)

### I.    Step Three of the Sequential Evaluation Process

#### A.  Listing 11.02

At step three of the sequential evaluation process the ALJ concluded that Couillard's headaches and seizures do not meet the severity requirements of Listing 11.02B or D. (Tr. 1461.) Listing 11.02B requires evidence of dyscognitive seizures occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02B. Listing 11.02D requires evidence of dyscognitive seizures occurring at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment, and a marked

limitation in one of the following: (1) physical functioning; (2) understanding, remembering, or applying information; (3) interacting with others; (4) concentrating, persisting, or maintaining pace; or (5) adapting or managing oneself. *Id.* at § 11.02D.

Couillard argues:

> [T]he ALJ says there is no evidence of migraines or seizures occurring for three consecutive months at a rate sufficient to meet Listing 11.02B or D. This is incorrect. Beginning February 4, 2011 through June 4, 2011, Couillard received treatment for headaches (some of which lasted for as many as 11 days) or tremors/seizures on February 4, 9, 11, 17, 25, March 2, 16, 24, April 12, 13, May 3, 9, 11, 25, June 3, 4, 17, 2011. [(Tr. 502, 511, 513, 515, 518, 551, 563, 572, 583, 589, 762-63, 765, 1157, 1410, 1412, 1414, 2398.)] There are many other references to intractable headache in the record, but this time period appears to meet the listing requirements.

(ECF No. 14 at 25.) Although there is evidence that during this time period Couillard suffered from tremors, some of which brought on headaches (Tr. 563, 819, 909), there is no evidence that she experienced dyscognitive seizures at least once a week, or at least once every two weeks, for at least three consecutive months. Dyscognitive seizures are characterized by an alteration of consciousness, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00H1b, and, while Couillard complained of tremors, weakness, and numbness in her arms and legs, she never complained of an alteration in her consciousness from February to June 2011. (*See, e.g.*, Tr. 564 ("She is completely alert when this occurs.").) As such, the ALJ did not err in finding that Couillard's migraines and seizures do not meet the severity requirements of Listing 11.02B or D.

### B. Listings 12.04, 12.06, 12.07, 12.08, and 12.15

The ALJ also concluded that the severity of Couillard's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04, 12.06, 12.07, 12.08, and 12.15." (Tr. 1461.) In making that conclusion, the ALJ considered whether the "Paragraph B" criteria were satisfied. "To satisfy the 'Paragraph B' criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." (Tr. 1462.) The ALJ found that Couillard has no extreme or marked limitations, finding only moderate limitations in each area of functioning. (Tr. 1462-63.) As to her limitation with concentration, persistence or maintaining pace, he explained:

> [Couillard] has reported that her ability to pay attention is variable, as she has difficulty concentrating when anxious. However, the record reflects that she has engaged in activities requiring a degree of concentration and persistence, particularly contributing to the care of her children and driving them to school forty-five minutes from her home, taking online classes, taking nature photographs and having them developed through an online service, watching episodes of television, scrapbooking, and doing puzzles consisting of 500 to 750 pieces over multiple sittings. Further, at a July 2011 consultative psychological examination, [Couillard] engaged in goal-oriented and meaningful conversation, showed adequate motivation, and showed no significant deficit in attention, concentration, or mental control. Similarly, at a September 2016 consultative psychological examination, [Couillard] was able to do serial 7s and 3s, spell "world" forward and backward, follow a three-step command, and track conversation without difficulty. Thus, while [Couillard] undoubtedly has some limitation in this

domain, the overall evidence of record does not support a finding that these are more than moderate.

(*Id.*) (Internal citations omitted.)

Couillard argues that the ALJ "cherry-picked the record" when "he discounted [her] reports of inability to concentrate because, in February 2012, she was taking courses in nursing." (ECF No. 14 at 25-26.) She contends that "the same document upon which the ALJ relies for this information about on-line classes in February 2012 is the document in which [she] was determined to be too mentally ill to be a kidney donor." (*Id.* at 26.) (Citing Tr. 1050-51.) But there is no evidence that Couillard was determined to be an unacceptably risky candidate for a kidney donation due to concerns about her concentration, persistence, or pace. (*See* Tr. 1051 ("Given all that we know about Ms. Couillard and her personal, medical, and psychiatric history, I think that she would be an unacceptably risky candidate for this most elective of surgeries.").) This is not a case where the ALJ only analyzed evidence that supported his finding while ignoring evidence that undermined it. *Cf. Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("We have repeatedly held that, although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] conclusion while ignoring the evidence that undermines it.").

The ALJ further noted at step three that "no State agency psychological consultant concluded that a mental Listing is medically equaled." (Tr. 1463.) Couillard argues that "Dr. Wendorf's Statement of Work Capacity appears to be squarely at odds with the ALJ's

statement." (ECF No. 14 at 16.) (Citing Tr. 1463, 2100.)  While it is true that consultative examiner Anthony Wendorf, Psy. D., opined that Couillard's mental impairments met or medically equaled a listing (Tr. 2097-101), Dr. Wendorf is *not* a State agency psychological consultant. Therefore, the ALJ did not err in stating that no State agency psychological consultant concluded that Couillard's mental impairments medically equaled a mental listing.

## II.     RFC Determination

### A. Concentration, Persistence, or Pace

The Court of Appeals for the Seventh Circuit has held that "[b]oth the RFC and the hypothetical question presented to the [vocational expert] must incorporate the 'totality of a claimant's limitations,' including any 'deficiencies of concentration, persistence and pace.'" *Mischler v. Berryhill*, __ F. App'x __, 2019 WL 1299948, at *5 (7th Cir. March 20, 2019) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)). "The ALJ need not use this exact terminology, so long as the phrasing 'specifically exclude[s] those tasks that someone with the claimant's limitations would be unable to perform.'" *Id.* (quoting *O'Connor-Spinner*, 627 F.3d at 619) (alteration in original); *see Winsted v. Berryhill*, 915 F.3d 466, 471 (7th Cir. 2019) ("Though particular words need not be incanted, we cannot look at the *absence* of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and in the hypothetical question." (emphasis in original)).

The ALJ concluded, in part, that Couillard has moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 1462-63.) Given these limitations, the ALJ limited Couillard to (1) "simple, routine, and repetitive tasks, and not at a production rate pace (e.g., assembly line work)"; (2) frequent interaction with supervisors, occasional interaction with coworkers, and no interaction with the public; (3) occasional changes in a routine work setting; and (4) the flexibility to be off-task up to ten percent of the workday in addition to normal breaks. (Tr. 1464, 1582-83.) He explained:

> [Couillard's] … mental health conditions and associated symptoms (i.e., decreased concentration, attention, and memory; increased anxiety in social or stressful situations), are accommodated by a restriction to work involving only simple, routine, and repetitive tasks and not at a production rate pace (e.g., assembly line work); simple work-related decisions; only frequent interaction with supervisors, occasional interaction with coworkers, and no interaction with the public; and occasional changes in routine work setting. Due to subjective reports of brief periods of confusion following pseudo seizure, as well as isolated clinical observations as to decreased attention and concentration, the undersigned finds [Couillard] will be off task less than 10 percent of the time in an 8-hour workday, in addition to normal breaks.

> The undersigned notes that the off task limitation is appropriate given [Couillard's] severe impairments. However, the limitation is not meant to express a precise percentage of time the claimant will be off task. …. In the instant matter, the off task limitation reflects a belief that [Couillard] has medical conditions that will cause her to be off task at work. However, the amount of off task behavior attributable to the severe impairments, given the totality of the record, is not found to arise to a level such that it would be work preclusive.

(Tr. 1470.)

Couillard argues that the ALJ failed to adequately account for her moderate limitations in concentration, persistence, and pace. (ECF No. 14 at 12-15.) Her argument finds strong support in several Seventh Circuit opinions, including *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019). The ALJ may have thought that limiting Couillard to "simple, routine, and repetitive tasks, and not at a production rate pace (e.g., assembly line work)" and allowing Couillard the flexibility to be "off task less than 10 percent of the time in an 8-hour workday" was sufficient to account for her moderate difficulties in concentration, persistence, or pace, but the Seventh Circuit has made it clear that it is not:

> We have previously rejected similar formulations of a claimant's limitations because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, or pace. *See Moreno [v. Berryhill]*, 882 F.3d [722, 730 (7th Cir. 2018)]; *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016). The ALJ's analysis is similarly flawed with respect to [the claimant's] mild limitations in understanding, remembering, and carrying out simple instructions and her moderate limitations in concentration, persistence, and pace as found by Dr. Goldstein. An ALJ need not use "specific terminology," but we have "repeatedly rejected the notion that a hypothetical … confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014); *see also Winsted v. Berryhill*, No. 18-2228, 2019 WL 494052, at *4 (7th Cir. Feb. 8, 2019); *Varga v. Colvin*, 794 F.3d 809, 804 (7th Cir. 2015).

*DeCamp*, 916 F.3d at 675-76; *see Godfrey v. Berryhill*, No. 17-C-1721, 2019 WL 1220325 (E.D. Wis. March 15, 2019) (finding that the ALJ's RFC limiting plaintiff to "simple, routine, and repetitive tasks but not at a production rate pace (e.g. assembly line work)" and

allowing plaintiff the flexibility to be off-task "10% of the time in a 8-hour workday" failed to account for plaintiff's moderate difficulties in concentration, persistence, or pace).

The ALJ also erred in failing to include the additional limitations that Dr. Warren noted Couillard had with respect to other more specific areas within the concentration, persistence, or pace realm, including the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 1663.) Having given "great weight" to Dr. Warren's opinion, the ALJ was required to include those limitations in both the RFC and the hypothetical posed to the vocational expert, or explain why he did not. *Godfrey*, 2019 WL 122035 at *4; *see DeCamp*, 916 F.3d at 675.

While the Seventh Circuit recognizes three circumstances where an ALJ need not explicitly address a claimant's limitations in concentration, persistence, or pace, *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017), none of those exceptions apply here. As such, remand is necessary so that the ALJ can incorporate Couillard's moderate limitations in concentration, persistence, or pace into the RFC and the hypothetical question posed to the vocational expert.

**B. Conversion Disorder**

Couillard appears to argue that the ALJ erred in his evaluation of her conversion disorder. (ECF No. 14 at 18-25.) A somatoform conversion disorder "is a mental illness that causes bodily symptoms even though the symptoms cannot be traced to a physical cause." *See Taylor v. Colvin*, No. 4:14-cv-00010-TW-DML, 2015 WL 1166159, at *4 (S.D. Ind. March 13, 2015) (citing http://www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatmeant).

> When bodily symptoms "involve any aspect of the central nervous system over which voluntary control is exercised" … the mental health disorder is described as a conversion disorder. *See* www.ncbi.nlm.nih.gov/pubmed/15101499 (Somatization and conversion disorder) ("Conversion disorder occurs when the somatic presentation involves any aspect of the central nervous system over which voluntary control is exercised.") "People with somatoform disorders are not faking their symptoms. The pain and other problems they experience are real. The symptoms can significantly affect daily functioning." *See* http://www.webmd.com/mentalhealth/somatoform-disorders-symptoms-types-treament.

(*Id.*)

Couillard contends that

> the ALJ's decision as well as the various consultative medical and psychological examinations and reports prepared by state agency personnel show that [her] physical symptoms were not evaluated in combination with her mental impairments. [Her] physical symptoms were gauged against physical testing and were not evaluated in combination with her mental impairments. The reverse was also true. The psychologists who evaluated her mental impairments "deferred" to physicians to evaluate her physical impairments. Thus, no doctor properly evaluated the physical limitations that flowed from the somatoform disorder. That

violated the precedent of [*Adaire v. Colvin*, 778 F.3d 685 (7th Cir. 2015)], that the combined effects of impairments must be properly evaluated.

(ECF No. 20 at 7-8.)

However, as the Commissioner points out, Couillard does not explain how her conversion-related impairments translate into work preclusive limitations that the ALJ failed to address. (*See* ECF No. 19 at 7.) Couillard describes her history of impairments (ECF No. 14 at 20-25), but does not make an argument that they caused limitations not included in the RFC. Unlike the ALJs in *Adaire* and *Taylor*, the ALJ here did not discount any of Couillard's physical symptoms because they were unsubstantiated by objective medical evidence. *See Adaire*, 778 F.3d at 687 ("[The ALJ's] principal error, which alone would compel reversal, was the recurrent error made by the Social Security Administration's [ALJs], and noted in many of our cases, of *discounting* pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays.") (emphasis added); *Taylor*, 2015 WL 1166159 at *6 ("The ALJ's failure to [consider claimant's medical problems in combination] in this case, when there is substantial evidence that [claimant's] physical problems are related to a very real mental impairment and should not be *discounted* or not accommodated because of the lack of underlying physical causes, requires the court to reverse and remand the Commissioner's decision.") (emphasis added). Because she fails to explain how her conversion-related impairments translate into work preclusive limitations that the ALJ failed to address, Couillard has not shown that the ALJ erred in his evaluation of her conversion disorder.

*See Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) ("It was [claimant's] burden, not the ALJ's, to prove that she was disabled.") (citations omitted).

## C. Absenteeism

"In determining an individual's RFC, the ALJ must evaluate *all* limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (citing SSR 96-8p, 1996 WL 374184; *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)) (emphasis added). This includes "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication) [.]" SSR 96-8p, 1996 WL 374184, at *5.

Couillard argues that the ALJ's RFC determination fails to adequately account for her absenteeism:

> In 2011, Couillard would have missed work for medical care on 32 separate days. This care included eight emergency room visits, and one inpatient hospital stay. In 2012, she would have missed 35 days, including 16 emergency room visits and one inpatient hospitalization. In 2013, she would have missed 18 days, with five ER visits and one inpatient hospitalization. In 2014, she would have missed 23 days, in 2015, 17 days including eight days of partial hospitalization for psychiatric care, and in 2016, she would have missed 28 days, including having three surgeries which required general anesthetic.

(ECF No. 14 at 11-12.) "[Her] physical and mental impairments leave her incapable of maintaining full time employment." (*Id.* at 11.)

The court agrees with Couillard. Although almost every doctor of record opined that Couillard is limited in her ability to maintain regular work attendance (*see* Tr. 840, 1012, 1144, 1434, 1663, 1680, 2009, 2472-73), the ALJ did not discuss her absenteeism in his RFC determination. *Cf. Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) ("[T]he ALJ overlooked the extent to which [the doctor's] opinions were consistent with the diagnoses and opinions of other medical sources who treated [the claimant]."). The vocational expert testified at the October 2017 hearing that being "absent from work two days per month, month after month in a 12-month period," would be work preclusive. (Tr. 1586.) Therefore, the ALJ on remand must determine whether Couillard's limitation in her ability to maintain regular work attendance, including as a result of hospitalization, emergency room visits and doctor appointments, is work preclusive.

## III.    Couillard's Testimony

Couillard argues that the ALJ committed harmful error by not addressing her testimony from the first two hearings—specifically, testimony that (1) she stopped working due to tremors and anxiety, (2) she continued to have panic attacks despite taking medication, (3) she had adverse reactions to Lyrica, (4) she has a history of self-mutilation and impulsive decision-making, and (5) that her interstitial cystitis caused her to need to go to the bathroom 20 times a day. (ECF No. 14 at 26-27.) She contends that the ALJ was required to discuss and articulate his reasons for rejecting her prior testimony. (*See Id.* at 27.)

Although the ALJ was required to consider Couillard's prior testimony, *see Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017); *Halvorsen v. Heckler*, 743 F.2d 1221, 1226 (7th Cir. 1984), there was no requirement that he cite to her testimony from prior hearings. *See Parker v. Colvin*, 660 F. App'x 478, 482 (7th Cir. 2016). At the October 2017 hearing, the ALJ told Couillard that he had "reviewed all of the records that currently make up [her] file" and he would "consider all of the testimony and … come to [his] own conclusion in this matter." (Tr. 1533.) Couillard has not offered any evidence that the ALJ failed to consider her prior testimony in his RFC determination.

Couillard also argues that the ALJ "selectively discussed statements which supported denial of benefits without evaluating statements contrary to his determination." (ECF No. 14 at 27-28; *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ … cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").) She contends:

> [T]he ALJ wrote that [she] testified she was pursuing an associate degree in nursing. He failed to note, however, [her] testimony that she had been able to attend only one or two classes before having a seizure in class and having to drop out of school. He also wrote that [she] was able to tend to her personal care, take care of her children, prepare meals and do household chores. He did not note [her] testimony that about two times a week she needed someone to be with her when she showered because of dizziness and shaking. When she watched television she had to alternate between sitting, standing and lying down. She had fibromyalgia pain on a daily basis. She liked to read, but could not concentrate to read more than five pages. The ALJ noted that [she] enjoyed scrapbooking, but ignored her testimony that she had done no scrapbooking for over six months, and prior to that, engaged in the activity only about twice a month for an hour each time.

(*Id.* at 28.) (Internal citations omitted.) However, contrary to Couillard's contention, the ALJ recognized that she has a history of tremors and "pseudoseizures" (Tr. 1466), suffers from back pain (Tr. 1465), and has difficulty concentrating (Tr. 1470). This is not a situation where the ALJ cherry-picked the record to support his conclusion while overlooking evidence that undermined it. *Cf. Moore v. Colvin*, 743 F.3d at 1123. Rather, the ALJ analyzed the extent of Couillard's daily activities, in conjunction with the rest of the record, to assess her subjective symptoms. Given that the ALJ did not ignore an entire line of evidence favoring Couillard, he did not err in his evaluation of Couillard's testimony.

Couillard further argues that the ALJ made no effort to consider the type, dosage, effectiveness, and side effects of her medications in evaluating her symptoms. (ECF No. 14 at 29.) Although she contends that she experiences drowsiness and headaches from her medication (Tr. 37, 415, 1959), she has not shown that those side effects necessitated further restrictions in her RFC. As such, the ALJ's failure to discuss the side effects of her medications was not error. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) ("[The claimant] also contends that the ALJ ignored limitations caused by … the side effects of her medications. But these limitations had little support in the record; what did appear in the record did not support limitations so extreme as to establish a disability. The ALJ's failure to discuss them was thus not in error.").

## IV. Medical Opinion Evidence

### A. Treating Physicians

#### 1. Dr. Shah

Although it's unclear, Couillard seems to argue that the ALJ erred in giving little weight to the opinion of Dr. Raskesh Shah, Couillard's treating psychiatrist. (ECF No. 14 at 32.) Dr. Shah opined that Couillard's symptoms would cause her to miss work about four days per month. (Tr. 1012.) He also said that she had extreme deficiencies in concentration, persistence or pace, which if credited would require a finding of disabled under Listing 12.07. (*Id.*) However, Couillard does not develop her argument, explaining why the reasons the ALJ provided for discrediting Dr. Shah's opinion were unsupported by substantial evidence. *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Having not developed any argument relating to the ALJ's treatment of Dr. Shah's opinion, it is waived. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

#### 2. Klecker and Vele

Couillard also seems to argue that the ALJ erred in evaluating the opinions of Couillard's psychotherapist Deborah Klecker and Couillard's treating psychiatrist Kathryn Vele, APNP. (ECF No. 14 at 32-34.) Couillard contends that the ALJ inappropriately "played doctor" and failed to consider that both Klecker and Vele opined that she would miss work four or more days per month due to her impairments, which is consistent with other treating and examining opinions of record. (*See Id.*)

As noted above, the court has found that the ALJ's failure to consider Couillard's absenteeism in his RFC determination is an error warranting remand. In his evaluation of Couillard's absenteeism on remand, the ALJ shall consider the extent to which the opinions of record are consistent with regard to her absenteeism. *See Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) ("[T]he ALJ overlooked the extent to which [the doctor's] opinions were consistent with the diagnoses and opinions of other medical sources who treated [the claimant].").

## B. State Agency Reviewing Physicians

Couillard argues that the ALJ improperly relied upon "outdated or incomplete State agency opinions" because the "State agency doctors" did not evaluate the effect of her conversion disorder on her physical limitations. (ECF No. 14 at 29-31.) However, as stated above, Couillard has failed to show that she experiences additional physical limitations from her conversion disorder that were not accounted for in the RFC.

Moreover, the ALJ gave great weight to the February 2017 opinions of state agency medical consultant Mina Khorshidi, M.D., and state agency psychological consultant Dr. Warren, both of whom were aware of the effects of Couillard's conversion disorder. Dr. Khorshidi opined that Couillard has the following exertional limitations due to back pain and seizures: occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking (with normal breaks) for a total of about six hours in an eight-hour workday, and sitting (with normal breaks) for a total of about six

hours in an eight-hour workday. She also opined that Couillard is limited to frequent postural activities (i.e., climbing, balancing, stooping, kneeling crouching, crawling) due to back pain. She further opined that Couillard must avoid concentrated exposure to hazards (machinery, heights, etc.) and fumes, odors, dusts, gases, and poor ventilation due to her history of "*psychiatric pseudoseizures*, headaches, and asthma." (Tr. 1677-79.) (Emphasis added.)

Dr. Warren opined that Couillard is markedly limited in her ability to understand, remember, and carry out detailed instructions, and interact appropriately with the general public; moderately limited in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers or peers without distracting them, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriate to changes in the work setting, and set realistic goals or make plans independently of others; and not significantly limited in her ability to understand, remember, and carry out short simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, be aware of normal hazards

and take appropriate precautions, and travel in unfamiliar places or use public transportation. (Tr. 1679-81.)

Given that Drs. Khorshidi and Warren assessed Couillard's physical and mental RFC in light of her conversion disorder (*see* Tr. 1675, 1678-79), the ALJ did not improperly "play doctor" in evaluating Couillard's conversion disorder.

### C. Consultative Examiners

#### 1. Dr. Rao

Couillard argues that the ALJ erred in giving only some weight to the opinion of consultative psychological examiner Dr. Kalpana Rao. (ECF No. 14 at 15.) Dr. Rao concluded that Couillard did not display any significant compromised cognitive abilities that could be affecting her executive functioning. (Tr. 823.) She opined that Couillard had an adequate ability to understand, remember, process, and carry out instructions; no difficulty with short term memory processes or concentration abilities; intact insight and judgment; an impressive ability for conceptual understanding, logical deduction, and general awareness; no difficulty with interpersonal relationships or anxiety in social situations that could affect her ability to participate in competitive employment; and a limited ability to adapt to change. (Tr. 823-24.) Couillard contends:

> In writing the report, Dr. Rao wrote that Couillard "reports she experiences flashbacks and nightmares of sexual abuse in the past. However, she does not describe any hypervigilance or intrusive memories." Tr. 821. One wonders, if flashbacks and nightmares are not intrusive memories, what is? The ALJ should have noted that, on it's (sic) face, this report appears to make no sense and to minimize Couillard's impairments.

(ECF No. 14 at 15.)

Contrary to Couillard's contention, the ALJ is not required to explicitly address a single discrepancy in Dr. Rao's report. *See Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013) ("[A]n ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence."). As such, the ALJ did not err in giving Dr. Rao's opinion some weight.

### 2. Dr. Wendorf

Couillard also argues that the ALJ erred in giving only some weight to the opinion of consultative psychological examiner Dr. Anthonly Wendorf. (ECF No. 14 at 15-16.) She contends that "[t]he ALJ wrote that he gave [Dr. Wendorf's] opinion 'Some weight' but he included none of Dr. Wendorf's opinions about [her] work capacity in the RFC presented to the [vocational expert]." (*Id.* at 16.)

Dr. Wendorf opined that Couillard has moderate limitations in her ability to understand, remember, and carry out simple work instructions; severe to marked limitation in her ability to respond appropriately to supervisors and coworkers; marked limitation in her ability to maintain concentration, attention, and work pace; and severe limitation in her ability to withstand routine work stress and adapt to changes. (Tr. 2100.) Although the ALJ discredited the degree of limitation assessed by Dr. Wendorf (Tr. 1474), he included restrictions in his hypothetical to the vocational expert to accommodate for Couillard's limitations in almost all of the areas Dr. Wendorf found her to be limited in:

This person would also have mental limitations with regard to understanding, remembering, and carrying out instructions. They'd be limited to performing simple, routine and repetitive tasks but not at a production rate pace. …. With regard to the use of judgment in the workplace, they would be limited to making simple work-related decisions, and then they would need to be in a work environment that did not require constant interaction with other people, and I would more specifically define that as follow [sic]; this hypothetical individual would be able to interact appropriately with supervisors on a frequent basis and would be able to interact appropriately with coworkers on an occasional basis, and then would not be able to interact appropriately with the public. So, then this person would also be limited to tolerating only occasional changes in a routine work setting, and lastly, in addition to normal breaks, this hypothetical person would be off task less than 10% of the time in an 8-hour workday.

(Tr. 1582-83.) As such, contrary to Couillard's contention, the ALJ did not entirely disregard Dr. Wendorf's opinion.

### D. Couillard's Neighbor

In 2014 Couillard's neighbor Kristi Batien wrote a statement concerning her observations of Couillard. Batien wrote in part:

[Couillard's] anxiety causes her difficulties in doing everyday activities such as being in public, being around people she doesn't know, driving, and going to the grocery store, they cause her stress and panic attacks that are debilitating to the point that she fears having an attack in public and doesn't want to leave her home. She also has a seizure disorder that complicates her life even more. In the last year she had has [sic] more than 5 seizures. The nervous breakdowns from her extreme anxiety cause her to seizure. On top of that she has rapid cycles of depression and mania. The depressive episodes cause [Couillard] to cry constantly for a week or so and she isolates herself even from her best of friends that understand her condition. She isolates to the point I have to call her daughters phone to make sure she's ok because I'm physically disabled and can't always physically check on her.

(Tr. 1425.) The ALJ concluded that "significant weight cannot be given to Ms. Batien's statements" because she is not a medical or vocational source and her statements about Couillard's recurrent seizures are not consistent with the overall evidence of record. (Tr. 1474.)

Couillard argues that "[i]t is reasonable to believe that Batien's reference to seizures includes [the] tremors Couillard reported to Dr. Geroulis. It is not [a] sufficient reason for the ALJ to discount Batien's entire statement." (ECF No. 14 at 34-35.) Although it might be reasonable to construe Batien's reference to seizures to include tremors, Couillard reported in November 2016 that she has not had any seizures the last four months, and, before that, may have had an occasional one once or twice a year. (Tr. 2385.) Couillard has not shown that the ALJ improperly evaluated Batien's statement. *See Truelove v. Berryhill*, ___ F. App'x ___, 2018 WL 6242284, at *3 (7th Cir. Nov. 28, 2018) ("We will not examine the facts anew, reweigh the evidence, or substitute our judgment for the judgment of the ALJ.").

## V. Step Five of the Sequential Evaluation Process

Couillard argues that each of the occupations identified by the vocational expert and relied upon by the ALJ at step five of the sequential evaluation process violate the ALJ's finding that Couillard must "never interact with the public." (ECF No. 14 at 16-18.) She contends that she is unable to perform those occupations because a laundry worker is required to work in a customer's home, a mail clerk is required to distribute mail in an

office, and a cleaner is required to render personal assistance to patrons. (*Id.*) However, given that the court has determined that remand is necessary, it will not address this argument. On remand, the ALJ shall ensure that the occupations identified by the vocational expert are consistent with the limitations provided in the RFC.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and this matter is **remanded** pursuant to 42 U.S.C. 405(g), sentence four, for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of March, 2019.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge